I am, Your Honor. Thank you. May I reserve three minutes for rebuttal, Your Honor? You may. May it please the Court. Counsel, my name is Carl Waring. I'm an Assistant Attorney General here on behalf of Ralph Reagan, Lee Thornton, and Columbia Basin College. And this case is precisely why we have qualified immunity. In 2017, Reagan and Thornton, two college administrators, found themselves in a very difficult situation. On one hand, they had R. W., a student who had recently experienced homicidal ideation, about three of his professors at college, wanting to return to the nursing program that triggered that homicidal ideation. And on the other hand, these two administrators had members of the college community who also had a right to be safe and secure when they come to the college campus. And so they attempt to balance those two interests. And in the end, the plan that comes out through the student conduct proceedings in the form of the conditions for return is the plan for R. W. to move forward, to return to the nursing program at the next available opportunity, which would have been winter quarter 2018. But R. W. simply didn't engage in that. In other words, in October of 2017, when R. W. was supposed to meet with Ralph Reagan to move forward, he elected not to. Neither that plan nor the interim trespass violate R. W.'s First Amendment rights, and certainly not clearly established law. I'd like to start the qualified immunity analysis by looking first at the clearly established prong. And in looking at the clearly established prong, there's a couple observations that should help the conversation today. The first observation R. W.'s burden to prove that the law was clearly established. If R. W. can't carry that burden, then Reagan and Thornton are entitled to qualified immunity. Second, what does it mean to prove that the law is clearly established? Well, in the words of the U.S. Supreme Court in Ashcroft, it means that the law has to be developed in such a way that it places the issue beyond debate. And another description of what it means to be clearly established is that the law has to be developed in a concrete and factually defined context, such that every reasonable administrator would know that what they're doing violates the law. So with those two observations in mind, we turn to what is the body of law here? What body of law tells Reagan and Thornton at the time that they act that what they were doing was clearly unconstitutional. So we look for cases that deal with identifiable and credible threats on the college campus where administrators are required to balance competing interests. And there are none. There are none certainly that support R. W.'s position. Well, let me let me ask you this, because the plaintiff's theory is that your clients actually determined that R. W. no longer posed the threat that it was OK to bring him back to the nursing program, essentially got assurances from his medical providers that that was the case. And yet your clients nonetheless imposed these punitive conditions on his return, which were, you know, I don't know if they are the reason he's no longer pursuing his nursing degree, but they were essentially punishment in the same way in Levine that the maintenance of that negative documentation in the student's record was deemed punishment and therefore unconstitutional. So maybe can you just respond to the plaintiff's framing of the case and explain why you don't think that's persuasive? Certainly. And what we first look at is the record, your honor, because plaintiff's framing isn't supported by the record. If we take a look at the testimony by Ralph Reagan about his contact with the transitions providers who he interviewed following R. W.'s release from transition, it's Reagan's testimony that those providers expressed concerns about R. W.'s return and that they were equivocal about his return to the nursing program. We can look at the testimony of Dr. Kabosig, R. W.'s personal physician, who testified that he didn't offer assurances that homicidal ideation wouldn't reoccur if R. W. came back to the nursing program. And we can look at the testimony of Aracelia Perez, who was the mental health professional who was intervening with R. W., who recommended that he be closely followed upon his discharge. And all of this is to say, again, coming from the testimony of Ms. Perez and Dr. Kabosig, that you don't know what's going to happen for this individual once he returns to the environment that triggered the homicidal ideation. So when plaintiff tries to frame the case as one of nobody had concerns anymore, that's simply not supported by the record. The concerns continue to exist and they continue to So it really isn't a fair framing of the case to say there is no concern. The other point, sorry, your honor, go ahead. Just one quick, if I can interject, the discharge records from the, whatever that facility was, you know, they indicate that he no longer poses a threat or something to that effect. And I guess is the basis on which he's being discharged. That doesn't give that the medical professionals there determined that, hey, the crisis has passed and he's now, he's now okay to resume his activities in society. So the short answer factually is no, it doesn't. Because when he returns to the community, he's not returning to the conditions that triggered his homicidal ideation. R. W.'s deposition testimony is very clear that what triggered his homicidal ideation was the bad feedback he was getting from his professors in the nursing program and his failing to progress in the program. He's not returning to those conditions. So we can't say simply because he's out of transitions, that it means that there is no risk, but there's a legal answer to the court's question as well. And all we have to do is look at the language that was used in McNeil in McNeil, albeit in the high school setting, not the collegiate setting. The decision didn't turn on the issue of whether or not there continued to be some kind of imminent risk to the college community. In fact, the court's language, the ninth circuit in 2019, focused on the idea that we're going to look at what was the intent and how did this information come to the college. But in the end, if it was reasonable for those college administrators to believe there was still an identifiable and credible threat to the campus community, then their actions were going to be reasonable. So we don't look to an imminent risk standard when we're trying to assign culpability to two college administrators who are trying to balance these competing interests. About the threat issue, because you suggested that whether something is a true threat depends on whether you have a criminal case or a civil case. What is your support for that bifurcation? Oh, well, the first place I would point, Your Honor, is footnote seven of the Weiner case, where this court actually pointed out that it wasn't yet answering the question or required to answer the question of whether or not the criminal standard would apply in the civil context. And the reason that the court reached that conclusion, and again, it's footnote seven of the Weiner case, is because it didn't have to. The Tinker analysis that was applied answered the question about whether or not the restrictions were acceptable or not within the First Amendment. So in other words, the true threat analysis is really an analysis that applies much more broadly than just the setting we have here. And it's an analysis to determine if speech is protected at all. But even if you conclude speech is protected, it's still necessary in this setting to go through the Tinker analysis, which is essentially why Weiner never answered the question. So that's part of the basis why we say we have to decide whether or not there's an objective or a subjective standard. And we know there's a We also know in the Ninth Circuit, that question hasn't been squarely addressed, although we know in the criminal context, it's always going to be that subjective standard. We suggest in this case, it would be error to make it a subjective standard rather than an objective standard. And the primary turn or question that we think that should turn on is where are you trying to assign culpability. So in the criminal context, when you're assigning culpability to the speaker and talking about taking away their liberty, there is a poll and it makes sense that it stands constitutionally that it has to be a subjective test. But that's not our context here. Here, we're pointing to two administrators and trying to assign culpability for them or to them for violating somebody's civil rights. And in that context, we really ought to be looking at it from the perspective of the objective, reasonable person who is in their shoes. Did they objectively and reasonably believe that this was a true threat or a true risk? And that... Back to your Tinker comment, because as you know, and as everyone has pointed out in the briefs, Tinker has not been extended to the university context. And a lot of the secondary school threat cases lack one of the issues that's so critical here. And that was the seeking of professional help. So it's, you know, I understand the concern about of the college and university setting of not burdening the administrators with having to make all these difficult situations. On the other hand, if you come out with a holding that you might suggest, you really are deterring students from doing what they should do, which is to seek professional help. But if they know that that will result in their suspension, then you've really shut the door on that avenue of professional counseling. So how does that weigh in your mind in this case and on cases going forward? There's really three points there. And to start with the first about how it weighs on this case, the court just observed in its question that Tinker hasn't been extended to the college setting. So if that's true, if we accept that proposition, it means Reagan and Thornton are still entitled to qualified immunity because the law is not clearly established about if it applies or if it doesn't apply. Second, we suggest that Tinker actually has been extended to the college setting. And that's what happened in Healy. Now, although the Healy court, the U.S. Supreme Court, didn't ultimately conclude that there was sufficient evidence to meet the Tinker framework, the substantial disruption framework, they actually analyzed the substantial disruption framework in reaching that conclusion. And this isn't just me and my conclusion of Healy. We can look at the 10th Circuit in the Hunt case, which actually observes that Healy extended Tinker to the college setting. But if we didn't have Healy, we would still have the 8th, 10th, and 11th of the court's question is much more focused on, are we going to chill somebody's reporting? And that's the emotional pull of this case and what ways for RW. But that's not the dispositive factor. And there's a few areas we can look to to understand it shouldn't be dispositive in this case. And the first thing that I'd like the court to observe is that when you reach this threshold, in other words, you're making homicidal ideation, like declarations of this is what I'm feeling, and a mental health professional is called in to do a civil commitment evaluation, we've already had the balancing of whose rights need to give way. Because if you're in a civil commitment setting, and you're disclosing homicidal ideation, and that mental health professional believes that you represent a risk, as happened here, because what Arcelia Perez did was tell Mr. I'm sorry, tell RW, that he either checks himself into transitions, or she's going to civilly commit him. And RW admitted as much in his deposition. So when you reach that threshold, you can be civilly committed, your freedom of movement, your liberty in that regard can be restricted, because of the risk that's posed, it shouldn't be any different for a college administrator, who reasonably sees an identifiable incredible threat of some kind of physical harm to the campus community, and has to balance those interests. That's one prism for looking at it, which is the potential civil commitment. The other thing that gets implicated in these cases relates to the college codes and that lead to suspension. How does that figure in here? Well, in this case, in particular, there's been no facial challenge to the college code. In other words, all we're looking at is was the First Amendment violated, so we turn to the Tinker test. Had there been a facial challenge? I think there's different questions. But frankly, it's a little precarious to try and dive into where do we have our twists and turns. We can understand from college code cases that we have in the Ninth Circuit, in particular, what was relied upon by the district court here, that those cases didn't deal with identifiable and credible threats of physical harm to somebody within the community. So they don't offer much help, especially in the clearly established prong. With that, my time's out, and I would like to reserve the rest of my time for rebuttal. All right. The truth is that you've spent all your time, but actually I spent all your time asking you questions. So I am going to return some time on the clock for your rebuttal. I'm sorry I missed that, Your Honor. Your Honor, may it please the Court. In this matter, the case before this Court deals with of can a college punish a student for speech that student made to their doctor in the course of seeking medical treatment? In this case, my client went to his doctor seeking help. The next day, he was trespassed from school. The day after that, he was kicked out of the nursing program. The next week, the faculty at the nursing program was told he would not be returning and that he would be facing additional consequences from the Dean of Student Conduct. That came to pass. After more than a month of investigating this matter, and Ralph Reagan as Dean of Student Conduct, recognizing that the medical record showed no serious concerns about my client after the initial days of treatment, he proceeded to find my client guilty of engaging in abusive conduct under the student code, creating a hostile education environment, and proceeded to You cannot impose or punish speech, protected speech, of a student by trying to call that conduct under a student code. Can I ask you to respond on that point to your opponent's argument that you just made, that in fact the school never imposed any kind of punishment, but rather the university officials, Mr. Reagan in particular, determined that there was still a legitimate concern, a safety concern, that needed to be addressed and that the conditions that were imposed on your client's return to the program were merely designed to address to impose punishment. How do you respond to that? Those assertions are unsupported by the record. First and foremost, when we look at the sanction letter itself, it says these are sanctions, we have found you guilty of misconduct, and here are your sanctions. In addition to that, we can see that the other consequences my client suffered, which was being discontinued from the program the very next day. And then finally, we look at it, when my client asks about what does this look like if I try and come back to the program, what Ralph Reagan tells the director of this program is to refer my client to the nursing handbook, which says he is ineligible to return. And then at summary judgment, you get the concession that it would have taken nothing less than dispensation from the college's president to allow him back into that program, and that never happened. So not only is that unsupported by the record in regard to, there's additional things beyond just what's put forth in this sanctions letter in April. The sanctions letter itself calls these actions sanctions for engaging in misconduct. They are explicitly calling my client going and talking to his doctor and seeking help misconduct under the student code. But you say that the school officials, again, Mr. Reagan in particular, had determined that there was no safety risk that still was posed by your client. I guess I do read Reagan's, I think it's his deposition testimony to suggest otherwise, what is your support for the contention that they had determined that everything's clear now? Sure. And so the only place that I see anything that suggests that Mr. Reagan thinks there is a continuing concern is his testimony about what Araceli Perez says. So if you look at his notes of the investigation, ER1086, it says those concerns are being treated and he has shown medical professionals no serious concerns since the initial day, first days in treatment. You can see from his testimony in the deposition, going through those notes that this is what he was reviewing in the medical records. Additionally, you have the president, Lee Thornton, saying that it would have been a dereliction of his duty to allow RW back to campus if he thought there was any threat he was going to come and kill people. Finally, one thing I would point out is that when you look at the deposition testimony of Dr. Khabbasi, counsel for the state asks if he stopped his letter short in regard to providing assurances that he posed no continuing threat. And Dr. Khabbasi explicitly said, no, that's not, I didn't have any logical reason to stop there, other than to say that it something isn't going to happen. So when you get down to it, the best evidence that there is some sort of medical continuing concern is Mr. Reagan's deposition testimony about what he recalls Araceli Perez saying, because those assertions are not supported by the Lord's records. They're not even supported by Mr. Reagan's own notes. Could you address the qualified immunity in terms of the clearly established law? Because some of what we've been talking about is whether there actually has been a constitutional violation, but we also have the alternative, as you know, to determine was there clearly established law on this point? So I'd appreciate your comments on that and your response to Mr. Waring. Sure. And so part of this is a battle of the framing, which is our position is that we look at what they, the school actually did in this case, which is impose sanctions against a student for speech by trying to categorize that as conduct and misconduct. And we have cases from all across this country saying, no, you can't do that. And what they want to argue as well, that doesn't really address the sort of serious concerns here. This is people being, for lack of a better word, offensive. And I disagree with that. And one of the most clear examples of that is McCauley out of the Third Circuit, which is talking about a student who is contacting a student who has accused his friend of rape. And we're talking about something well beyond just being offensive or something along those lines in regard to that. These cases fall where they lie, which is if they're speech cases, they have to be about speech. So if we're running into a place where there's conduct involved, there's not going to be court cases on that effect. But we can also look at, there are cases where courts have in part imported the true threat standard into college campuses. And the three that I could find on this are this circuit, which has to do, which is 261 F3D 775, which is about a disgruntled staff member making cartoons about the president and trustees, alluding to shooting them, maiming them, that sort of thing. And ultimately, the court imposed or looked at it from these are not true speech standard. The other places are Feminist Majority Foundation versus Hurley, which is out of the Fourth Circuit, which is 911 F3D 674. And it's talking about students who want protection from comments on social media that are critical of this feminist foundation or this group, including some admittedly very gross stuff, rape allegations, that sort of thing. And the school tries to say, well, we can't regulate this because First Amendment. And the court doesn't say tinker. It says, no, these are true. You look at this from true threats analysis. And then the final place is one of the cases cited by Mr. Waring, which is Doe versus Rector George Mason, which is about the student alluding to shooting himself. And that is a case where it has this discussion about tinker, but ultimately it goes into threatening to shoot yourself is not a true threat. So from that standpoint, and based on the facts of what happened in this case, that is the correct analysis in our position. But even if we were to accept that not only does tinker apply in the college setting, not only does tinker apply off campus in the college setting, we still have Levine as the background of how this would work, even if this were a high school, which is you can't get to the end of this investigation, conclude the person did not engage in misconduct and then still proceed to sanction them anyway. And that's, I mean, that's very clear from Levine is this decision that they made over a weekend with some facts that they said that anyone can. Well, let me take you back. Judge McEwen's question about clearly established, because if we're looking at the clearly established problem, do you have any support for a case that found clearly established when there was a split in the circuits where at least four or five circuits would have applied the rule one way and circuits would apply the ruling other way? And doesn't that in itself fly in the face of something being clearly established? I don't have a case that stands for something to that specific proposition, but I'd point back to it doesn't matter which path you go down, because ultimately there is a case that clearly establishes that you could not proceed to punish a student after the investigation. So even if we were to agree that there is some sort of circuit split in regard to whether tinker can apply in the district or university context in this situation, even if you go down the tinker path, we have a clearly established case in the Ninth Circuit itself that says you cannot then proceed to punish a student after the investigation shows that they did not engage in a threat or so. And that's what Levine is. What do you say? What do you say to counsel's position that indeed the medical record doesn't reflect that, that the two individuals who imposed the sanctions had every reason to do so based on what they had heard, the mental health professional and the doctor? Once again, I don't think his position is particularly well supported by the record. I'd also note that qualified immunity, this is about the light and the facts most favorable to my client. And then finally, the thing I'd point out to is we task a different government entity, a different source of government power for dealing with these issues, which is my client availed himself to it, which is seeking help from medical professionals. And then ultimately, if deemed necessary by the state through probable cause thereafter, exceeding levels of scrutiny about whether this person poses a serious risk of harm to themselves or others. So the simple answer is I don't agree with Mr. Waring's characterization of the record in regard to continuing concerns. There's simply not anyone they can point to as a medical professional who says, I am concerned he is going to be a threat if he returns to college campus. He's trying to flip it around. Well, we have sufficient evidence assuring that that wouldn't be the case. Um, I guess one place that I'd add in unless the court has any additional questions on this is, um, where we start on this, which is my client did the right thing when he was experiencing mental health issues. He went to his doctor and he disclosed those because he wanted help. He wasn't trying to scare anybody. He wasn't trying to implement any harm against anybody. Uh, in fact, he dealt with these, these concerns for a week at school without having any conduct whatsoever to act upon him. He told them to his doctor seeking help and the school proceeded to kick, kick him out of the nursing program, trespass and from campus, and then ultimately impose sanctions against him. The message, if we hear you tell people who are in this situation, do not go seek help. You will face sanctions for this. You will be punished. Um, you need to deal with it yourself. Um, and that is not an acceptable outcome as far as what we want people in this situation to do. Um, and it's certainly not a basis for why we would create or expand a exception to the first amendment to protect or to allow the state to punish what could be doing this. We want patients to be able to tell their doctors, um, how they're feeling so that they can seek medical treatment. Um, and so if we were to impose this standard of we can regulate this speech, we can punish this speech. Um, we're telling students that they, and actually people at large there, they should not be making these disclosures to their doctors because the state can and will attempt to punish them for it. Can you just follow up on one thing you've said a couple of times now, you've said, uh, that the school kicked your client out of the program. And, and I, and I, I think I'd be, uh, much more inclined to see the case your way, but as, as I read the, not what happened instead, he was invited to come back to the program, but subject to conditions that he found, um, you know, uh, distasteful or, or, or burdensome. And so, um, but, but, but there wasn't a banishment of him from the program altogether. Am I missing something? Yes. I, I disagree with that. And so what, what you see is he is kicked out of the program the very next day. There is a student discontinuance under the program itself. It says he is not eligible to return to the program, uh, based on how he was dismissed and based on the fact that he had had previously re-enrolled in the program. And then you get this letter as far as the sanction says, you can come back and talk about letting you into CBC in general. And so my client asks, my client sends the email saying, how would I re-enroll back into the nursing program? And they don't answer. And then you get the answer of, it would take presidential dispensation to allow him to do so. And you'd expect to see something that says, and here's where we did this. It's not in the records because it didn't happen. So, um, when I look at it, what the record shows is, and especially in most favor of my client is that he was removed from the program. Um, and that is the end of my time. So unless the court has any other questions, thank you. Thank you. Um, Ms. Brebner, would you please, um, add three, uh, three minutes back on the clock, uh, for Mr. Warren. Thank you, Your Honor. Uh, six points I'd like to make. Um, I'll try and make them as quickly as I can. First, the issue of punishment. RW's just trying to slap a label on what the plan was for him moving forward. The court can find what those conditions were. It's the document number 30, which is the reference I have in front of me from the, um, trial court. And it's page 14 of our brief where it goes through and it lists out, here's how you get back into the nursing program. This is not punitive. This is a path forward. And because it's not punitive or purely punitive, it doesn't offend in the tinker analysis and it doesn't create a first amendment violation. Now there's a related, and this is my second point, there's a related factual issue that really needs to get cleared up because the record doesn't support the position taken by RW. RW on March 9th, while he's still in transitions, admits at that point he can't complete the nursing program winter 2018 quarter. He admits that. We see it in two different places in the record. Uh, the first place we see it is 556, and that's the actual note from transitions where they see it in the record is 536 and 37, where he's asked about it in his deposition testimony. And he concedes that's the point in time at which he knew he couldn't complete 2018. I'm sorry, 2017 winter quarter. What that means is he can't go on to the next semester because these are sequential classes. So before there's the trespass, before there's conditions for return, he already is not coming back to school until winter of 2018. So the idea that there was some kind of punitive action taken here through this plan is completely false. We then turn to the Mary Horner's declaration who explains because as RW observed during his deposition testimony, the program handbook, if you fail to successfully complete two times in a row, you have to start over. What Horner's declaration illustrates is that the plan that was put together by Reagan and approved by Thornton ultimately was the way for him to come back and start over regardless of that program handbook. So again, this is not a punitive action. With regard to Dr. Kovacic's testimony and our dispute there, the court can take a look at the record at 869 to 71 and make its own mind about what it is Kovacic is actually saying about being able to provide assurances. With regard to Levine, the distinction there is in Levine, the letter was in the student's file after the process was done. Here, the process never ran its course because RW didn't engage in those conditions. He never came back in October of 2017 to meet with Reagan to get back into the And then finally, with regard to the policy argument that we've heard, I'm sorry, I see my time is up. And in fairness, since I've already had more time, I'll stop there. I appreciate the court's time. I appreciate that. And thank you to both counsel for a very excellent briefing and also arguing this morning that case just argued of RW versus Columbia Basin College is submitted. The case of United States versus Edward is submitted on the briefs and we're adjourned for this morning. Thank you. Thank you, your honor. Thank you.
judges: McKeown, Watford, Rothstein